**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| U.S. Bank National Association,<br><br>    Plaintiff,<br><br>vs.<br><br>Casa Grande Regional Medical Center,<br><br>    Defendant. | No. CV 04-1707-PHX-NVW<br><br>**ORDER** |

The court has considered the parties' cross-motions for summary judgment (doc. ## 32, 34).

Plaintiff U.S. Bank National Association ("U.S. Bank") brought this action against Defendant Casa Grande Regional Medical Center (the "Hospital") for indemnification of a money judgment paid by U.S. Bank to Societe Generale in a separate lawsuit (the "New York case"). U.S. Bank asserts claims for breach of indemnity contract, equitable indemnity, and unjust enrichment.

**I.      Background**

This case arises out of three underlying contracts: the Bond Indenture, the Loan Agreement, and the Put Agreement. U.S. Bank was not originally a party to any of these agreements but is the successor in interest to the other banks involved. (doc. # 35 at ¶¶ 4, 15.)

1    The first two agreements — the Bond Indenture and the Loan Agreement — were
2 executed in conjunction with a 1986 revenue bond issuance by the Industrial Development
3 Authority of the County of Pinal, Arizona (the "Development Authority"). (doc. # 35 at ¶
4 1.) These two contracts were subsequently supplemented and expanded to cover another
5 bond issuance in 1993. (*Id.* at ¶¶ 5-6.) The purpose of both bond issuances was to provide
6 the Hospital with capital for property acquisitions and refinancing, capital which the Hospital
7 would then repay out of its revenues. (doc. # 33 at ¶¶ 1,5.)

8    The Bond Indenture was executed by the Development Authority and Arizona Bank.
9 (*Id.* at McMahon Aff. Ex. A at 1.) In relevant part, the Bond Indenture obligated Arizona
10 Bank to create a "Reserve Fund" into which roughly 10% of the Development Authority's
11 bond proceeds would be placed. (doc. # 35 at ¶ 2.) The fund was established to finance
12 scheduled payments to bondholders, at least to a limited extent, in the event that the bonds
13 were defeased or the Hospital's payments on the bonds became delinquent. (doc. # 33 at ¶
14 2.) Arizona Bank controlled the Reserve Fund as trustee and was required to invest the
15 money in the fund as directed by the Hospital. (*Id.* at McMahon Aff. Ex. A at 39.) The
16 investments of Reserve Fund money are referred to herein as the "Investment Securities."

17   The Loan Agreement was executed by the Development Authority and the Hospital.
18 (*Id.* at McMahon Aff. Ex. B.) Under the Loan Agreement, the Development Authority
19 loaned the Hospital all of the bond proceeds, including the 10% held in the Reserve Fund
20 (although the Hospital was not permitted to use that portion). After entering the Loan
21 Agreement, the Development Authority assigned all of its rights in the Loan Agreement to
22 Arizona Bank. (doc. # 35 at ¶ 1.)

23   The third contract — the "Put Agreement" — came later. The Put Agreement was
24 formally between Societe Generale and Bank of America Arizona, a successor to Arizona
25 Bank. (doc. # 33 at McMahon Aff. Ex. D at 1.) The Hospital, however, negotiated the Put
26 Agreement and directed Bank of America Arizona to enter it as trustee of the Reserve Fund.
27 (*Id.* at McMahon Aff. Ex. D at 1; *id.* at Pearson Aff. Ex. A at 2:23-26; 3:1-4.) The Put
28 Agreement was a hedging mechanism to allow the Hospital to reduce market risk associated

with the Investment Securities. (doc. # 35 at ¶ 8.) Pursuant to the agreement, Societe Generale agreed to purchase the Investment Securities in the future at a specified price; if the market price of the Investment Securities declined, Societe Generale would absorb the loss. (doc. # 34 at 1-2.) The Put Agreement also provided an upside for Societe Generale under certain circumstances if the value of the Investment Securities increased. (*Id.* at 2:1-3.) Additionally, Bank of America Arizona agreed to pay Societe Generale semi-annual fees, which were in practice covered by the Hospital; the Hospital would send the fees to Bank of America Arizona, which would forward the fees to Societe Generale. (*Id.* at 1:23-25; doc. # 33 at Pearson Aff. Ex. A at 3:11-15.)

By merger and/or acquisition, U.S. Bank succeeded Bank of America Arizona. U.S. Bank's rights and duties under the above contracts are the same as the rights and duties of the prior banks.

In July of 2001, the 1993 bonds were defeased. (doc. # 34 at 5:13.) An agent of the Hospital directed U.S. Bank to liquidate the related Investment Securities and apply the proceeds to remaining debt payments owed by the Hospital.[1] (*Id.* at 5:13-15.) The evidence indicates that the Hospital's agent instructed U.S. Bank specifically to sell the Investment Securities *on the open market*.[2] U.S. Bank complied, selling the Investment Securities on the

---

[1] It is settled for purposes of these motions that U.S. Bank liquidated the Investment Securities at the direction of an agent of the Hospital. U.S. Bank submits admissible evidence that an agent of the Hospital "directed U.S. Bank to liquidate the assets in the Reserve Fund . . . for crediting to a 'source of funds' pool that would be used . . . to satisfy the Hospital's debt obligations." (doc. # 33 at McMahon Aff. at ¶ 10.) While balking at this evidence as "unlikely," the Hospital submits no contrary evidence. (*See* doc. # 36 at 2:1-3:15.) The fact is therefore established on these motions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

[2] It is settled for purposes of these motions that the Hospital's agent instructed U.S. Bank to liquidate the Investment Securities on the open market. U.S. Bank submits the affidavit of Sheryl McMahon, which states: "[The Hospital's agent], acting on behalf of the Hospital, represented that the Hospital was entitled to have all assets in the Reserve Fund (*including all proceeds from the open market sale of the Investment Securities*) applied against the Hospital's debt obligations in connection with the 1993 bonds." (doc. # 33 at Aff.

- 3 -

1  open market instead of to Societe Generale, thereby breaching the Put Agreement.
2  According to U.S. Bank, it complied with the Hospital agent's directions and sold the
3  Investment Securities on the open market because it had no copy of the Put Agreement and
4  did not know of its obligations thereunder.  (doc. # 33 at McMahon Aff. at ¶¶ 10-11.)

5  By selling the Investment Securities on the open market instead of to Societe
6  Generale, U.S. Bank received a higher price; Societe Generale had the right under the Put
7  Agreement to buy the Investment Securities from U.S. Bank at a lower price than the then-
8  current market price.  U.S. Bank distributed the entirety of the money raised in the sale to the
9  Hospital in the form of reduced debt obligation.

10  Societe Generale thereafter brought an action against U.S. Bank in New York,
11  winning a judgment of $222,998.88.  (doc. # 35 Ex. G at 1.)  Interest aside, the award
12  equaled the market price of the Investment Securities less what Societe Generale would have
13  paid for them under the Put Agreement.  *Societe Generale v. U.S. Bank Nat'l Ass'n*, 325 F.
14  Supp. 2d 435, 437 (S.D.N.Y. 2004).  In other words, U.S. Bank had to pay Societe Generale
15  the incremental benefit wrought by selling the Investment Securities on the open market
16  (instead of to Societe Generale), $175.657.88, plus interest.  U.S. Bank's attempt to implead
17  the Hospital — to which U.S. Bank had remitted that incremental benefit — failed because
18  the Hospital was not subject to personal jurisdiction in New York.

19  To summarize, the Hospital initially had elected to pair its other Reserve Fund
20  investments with a hedging mechanism (namely, the Put Agreement), to reduce its
21  investment risk.  U.S. Bank, as trustee of the Reserve Fund investments, had implemented
22  that election for the Hospital.  Over time, the hedging mechanism turned to Societe
23  Generale's advantage, leaving the Hospital entitled to less than the overall value of the
24  Reserve Fund portfolio.  Yet, when U.S. Bank liquidated the portfolio for the Hospital, U.S.
25  Bank did not reduce the Hospital's distribution accordingly.  Instead, U.S. Bank distributed

26
27
28  at ¶ 10 (emphasis added).)  The Hospital has provided no evidence that the Hospital agent's instructions were other than to sell the Investment Securities on the open market.

- 4 -

to the Hospital — in the form of debt reduction — the full market value of all the Reserve Fund investments, including the portion to which Societe Generale was entitled. U.S. Bank was then sued and forced to pay the hedging investment liability out of its own funds. The Hospital refused to return the overpayment, leaving U.S. Bank short the amount of the overpayment, plus all the costs and fees arising from litigation.

**II.     Analysis**

U.S. Bank overpaid the Hospital when it liquidated the Reserve Fund, and the overpayment was directed by an agent of the Hospital. Under the parties' contract and under principles of unjust enrichment, U.S. Bank is entitled to a remedy.

**A.     Breach of Contract**

The Hospital breached the Loan Agreement by failing to indemnify U.S. Bank for U.S. Bank's liability and costs incurred in the New York case. The Loan Agreement provides for reimbursement of U.S. Bank's costs, fees and expenses incurred in the performance of U.S. Bank's duties under the Bond Indenture:

> In addition to all other payments hereunder, the [Hospital] agrees to pay the following items to the following persons . . . .
> (a) *To [U.S. Bank]*, when due, all reasonable *costs, fees and expenses* of [U.S. Bank] for services rendered or *incurred in performance of its duties under the [Bond] Indenture* . . . for which [U.S. Bank] . . . [is] entitled to payment or reimbursement under the terms of the [Bond] Indenture.

(Loan Agreement § 4.4, doc. # 33 at McMahon Aff. Ex. B at 20 (emphasis added).) One of U.S. Bank's "duties under the [Bond] Indenture" was to invest the Reserve Fund money as directed by the Hospital:

> Moneys in all funds and accounts held by [U.S. Bank] shall be invested by [U.S. Bank], as soon as possible upon receipt of immediately available funds at its principal corporate trust office, to the fullest extent possible in Permitted Investments *as directed, in writing or by telephonic or other reasonable means, by the [Hospital]*, or as selected by [U.S. Bank] in the absence of direction by the [Hospital] . . . .

(Bond Indenture § 5.4(a)(i), doc. # 33 at McMahon Aff. Ex. A at 39 (emphasis added).) U.S. Bank's compliance with the Hospital's directions to sell the securities in the Reserve Fund

- 5 -

1 constituted "performance" of that duty. Under Section 4.4 of the Loan Agreement, then, U.S. Bank should be recompensed for its related "costs, fees and expenses."

However, Section 4.4 of the Loan Agreement only provides for reimbursement of costs, fees and expenses "for which [U.S. Bank] . . . [is] entitled to payment or reimbursement under the terms of the [Bond] Indenture." (doc. # 33 at McMahon Aff. Ex. B at 20.) With regards to costs, fees and expenses arising out of litigation, the Bond Indenture expressly limits U.S. Bank's indemnification entitlement to those costs, fees and expenses not occassioned by U.S. Bank's own negligence or breach of trust:

> [U.S. Bank] may, nevertheless, begin suit, or appear in and defend suit, or do anything else in its judgment properly to be done by it as the Trustee, without prior assurance of indemnity, and in such case shall be entitled to reimbursement by the [Hospital] for all reasonable costs, expenses, attorneys' and other fees, and all other reasonable disbursements, including its own fees, and for all liability and damages suffered by [U.S. Bank] in connection therewith *except for [U.S. Bank's] negligence, willful misconduct or breach of trust.*

(Bond Indenture § 8.1(iv), doc. # 33 at McMahon Aff. Ex. A at 54 (emphasis added).) The court must therefore decide whether the exception for negligence or breach of trust releases the Hospital from its indemnification obligations under the circumstances presented.

### 1. The Hospital's Evidence is Insufficient to Prove Negligence or Breach of Trust

The Hospital, which would bear the burden of proof at trial with respect to U.S. Bank's negligence or breach of trust, has not submitted evidence from which a reasonable factfinder could determine that U.S. Bank breached the standard of care in selling the Investment Securities on the open market. The only evidence submitted by the Hospital are letters sent by U.S. Bank to the Hospital seeking payment of the Put Agreement's semi-annual fees, so U.S. Bank could then pass those fees along to Societe Generale. (doc. # 35 Ex. D.) The most such evidence proves is that U.S. Bank had knowledge of the Put Agreement's existence. U.S. Bank's knowledge of the Put Agreement, however, is entirely consistent with U.S. Bank having exercised due care in selling the Investment Securities

when and as instructed. Considering U.S. Bank's role in the parties' relationship, such knowledge alone would not support a finding of negligence.

U.S. Bank had no duty to police the communicated investment decisions of the Hospital for compliance with the Put Agreement. U.S. Bank was merely an escrow agent, holding the Hospital's Reserve Fund investments as security for the bondholders. In effectuating that limited role, U.S. Bank had a right and a duty to follow the Hospital's investment instructions. To saddle U.S. Bank with the obligation of double-checking each of the Hospital's decisions, under the guise of "duty of care," would be to impose upon U.S. Bank an obligation not contemplated by the fair meaning of the agreement. U.S. Bank's duty was to obey, and it performed that duty.

The "negligence" or "breach of trust" exception cannot be read so broadly as the Hospital would desire. The paradigm of negligence to be excluded by such a clause is one of independent negligence or mistake. To expand the exception to cover U.S. Bank's "improper" obedience, when such obedience is mandated by the parties' contract, would be to impose an internal inconsistency, which the court will not do. *See Climate Control v. Hill*, 86 Ariz. 180, 188, 342 P.2d 854, 859 (1959) ("A clause in a contract, if taken by itself, often admits of two meanings, when from the whole contract there is no reasonable doubt as to the sense in which the parties use it.").

### 2. The Hospital is Estopped From Arguing that U.S. Bank Acted Improperly

The Hospital, moreover, should be estopped from arguing that U.S. Bank acted improperly by liquidating the Investment Securities on the open market. Equitable estoppel "is a means of preventing a party from asserting a legal claim or defense which is contrary or inconsistent with his prior action or conduct." 28 Am. Jur. 2d Estoppel and Waiver § 28 (2006). In this case, the Hospital may not be permitted to claim that selling the securities on the open market was wrongful, after having instructed U.S. Bank to do precisely that.

"The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other

party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct." *Valencia Energy Co. v. Arizona Dep't of Revenue*, 191 Ariz. 565, 576-77, 959 P.2d 1256, 1267-68 (1998) (citations omitted). Here, all three elements are satisfied. The Hospital's instructions to U.S. Bank, which U.S. Bank followed, were inconsistent with the position it now adopts. The Hospital instructed U.S. Bank to sell the securities on the open market (and to give the Hospital the proceeds) but now seeks to avoid the repercussions of that instruction by claiming U.S. Bank acted wrongly by following it. U.S. Bank clearly relied on the Hospital's instructions, and, as a result, has suffered injury. Moreover, U.S. Bank's injury was a windfall to the Hospital. Under such circumstances, estoppel is appropriate.

### 3. Conclusion

The exception for negligence or breach of trust does not release the Hospital from its contractual obligation to indemnify U.S. Bank for U.S. Bank's disbursements in the New York case. That obligation also extends to costs and attorneys' fees. *Schweber Elecs. v. Nat'l Semiconductor Corp.*, 174 Ariz. 406, 412-13, 850 P.2d 119, 125-26 (App. 1992). Partial summary judgment on the issue of liability is therefore appropriate in favor of U.S. Bank.

## B. Unjust Enrichment

In the alternative, U.S. Bank is entitled to reimbursement on a theory of unjust enrichment. "Recovery under the theory of unjust enrichment requires five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment and (5) an absence of remedy provided by law." *City of Sierra Vista v. Cochise Enters., Inc.*, 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (App. 1984) (citations omitted); *accord Stapley v. Amer. Bathtub Liners, Inc.*, 162 Ariz. 564, 568, 785 P.2d 84, 88 (App. 1989).

Here, U.S. Bank overpaid the Hospital upon liquidating the Reserve Fund. The overpayment was an enrichment (in the form of reduced debt obligations) that corresponded to U.S. Bank's subsequent impoverishment. A portion of the proceeds from the liquidation were owed to Societe Generale, leaving U.S. Bank (after the New York litigation) having paid this amount to both the Hospital and to Societe Generale. No justification exists for

1   requiring double payment by U.S. Bank and for allowing the Hospital to retain a benefit it
2   was not entitled to, and the Hospital has not alleged any form of detrimental reliance such
3   that its retention of the payment might be appropriate. *Capin v. S & H Packing Co.*, 130
4   Ariz. 441, 442, 636 P.2d 1223, 1224 (App. 1981) (noting where plaintiff had erroneously
5   paid money in excess of his contractual obligations that the "firmly established general rule"
6   allowed for recovery thereof, although not where the overpayment had led to detrimental
7   reliance by the payee); *Employers Ins. of Wausau v. Titan Int'l, Inc.*, 400 F.3d 486, 491 (7th
8   Cir. 2005) ("[T]he law does not permit a person to keep money that he has received by
9   mistake, just because the mistake is careless."). Even if the contract did not provide for such
10  relief, then, U.S. Bank would be entitled to a remedy under a theory of unjust enrichment.
11      The existence of the contract between the parties would not preclude that remedy. In
12  general, "where there is a specific contract which governs the relationship of the parties, the
13  doctrine of unjust enrichment has no application." *Brooks v. Valley Nat'l Bank*, 113 Ariz.
14  169, 174, 548 P.2d 1166, 1171 (1976) (citations omitted). However, an unjust enrichment
15  claim may be brought in the alternative, subject to a single recovery, so long as the unjust
16  enrichment claim does not seek to relieve the plaintiff of the effects of an express provision
17  in the contract. *See Trustmark Ins. Co. v. Bank One, Ariz., NA*, 202 Ariz. 535, 542-43, 48
18  P.3d 485, 492-93 (App. 2002) (discussing *Adelman v. Christy*, 90 F. Supp. 2d 1034 (D. Ariz.
19  2000)); *Johnson v. Amer. Nat'l Ins. Co.*, 126 Ariz. 219, 223, 613 P.2d 1275, 1279 (App.
20  1980). Here, even if the contracts did not provide for reimbursement, they in no way
21  *prohibited* reimbursement of such an overpayment. U.S. Bank's unjust enrichment claim
22  therefore does not seek to subvert any express provision of the parties' contract and was
23  properly raised in the alternative.
24      IT IS THEREFORE ORDERED that Plaintiff's motion for summary judgment (doc.
25  # 32) is granted.
26      IT IS FURTHER ORDERED that Defendant's motion for summary judgment (doc.
27  # 34) is denied.
28

1   IT IS FURTHER ORDERED that a status conference is set for **Friday, July 7, 2006,**
2 **at 9:30 a.m.** to address a schedule and procedures for quantification of damages.  The parties
3 shall submit by July 5, 2006, a proposed joint schedule, if they can agree, or separate
4 proposed schedules if they cannot agree.

DATED this 16th day of June 2006.

_____
Neil V. Wake
United States District Judge